NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3431-13T4

ESTATE OF SANDRA BRUST and PHILIP
BRUST, individually and as Executor
and Executor ad Prosequendum of the
Estate of Sandra Brust,

    Plaintiffs-Appellants,

v.

ACF INDUSTRIES, LLC, f/k/a
American Car & Foundry Co.;
AMSTED RAIL GROUP, individually
and as successor to and d/b/a
Griffin Wheel Company;
BOMBARDIER TRANSPORTATION
(HOLDINGS) USA INC.; CBS
CORPORATION, a Delaware
corporation, f/k/a Viacom, Inc.,
successor by merger to CBS
Corporation, a Pennsylvania
corporation, f/k/a Westinghouse
Electric Corp.; CARRIER
CORPORATION; CERTAINTEED CORP.,
individually and as successor-
in-interest to Gustin Bacon;
EATON CORPORATION, as successor-
in-interest to Eaton Electrical,
Inc., and Cutler-Hammer, Inc.;
FOSTER WHEELER ENERGY CORPORATION;
GENERAL ELECTRIC COMPANY; GE LEASING,
individually and as successor to ITEL
Leasing, The Pullman Leasing Company
and The Pullman Company; GRIMES
AEROSPACE CORPORATION, individually
and as successor to FL Aerospace
Corporation and Midland-Ross Corp.;
KAWASAKI RAIL CAR INC.; NEW YORK
AIR BRAKE CORPORATION; PULLMAN

APPROVED FOR PUBLICATION

November 19, 2015

APPELLATE DIVISION

TECHNOLOGY INC., individually and as successor to The Pullman Company; ROCKWELL AUTOMATION INC., as successor by merger to Allen-Bradley, Inc.; SIEMENS ENERGY & AUTOMATION, INC., f/k/a I-T-E Circuit Breakers; SQUARE-D COMPANY; THYSSENKRUPP BUDD CO., f/k/a and as successor to The Budd Company; TRANE US, INC., f/k/a American Standard, Inc., f/k/a Westinghouse Air Brake Company; TRINITY INDUSTRIES, individually and as successor to The Pullman Transportation Company and The Pullman Company; UNION CARBIDE CORP.; WABTEC CORPORATION, individually and as successor in interest to Westinghouse Air Brake Co. (WABCO) and MotivePower Industries, Inc.; GOULD ELECTRONICS, INC., individually and as successor-in-interest to ITE Circuit Breakers; OLD ORCHARD INDUSTRIAL CORP., individually and as successor-in-interest to Vapor Corporation; and AMSTED INDUSTRIES, INC., f/k/a American Steel Foundries (ASF),

    Defendants,

and

DELAWARE RIVER PORT AUTHORITY (DRPA), individually and d/b/a Port Authority Transit Corporation (PATCO); HONEYWELL INTERNATIONAL, INC., f/k/a Allied Signal, Inc. as successor-in-interest to The Bendix Corporation; PEP BOYS-MANNY MOE & JACK OF DELAWARE, INC.; PNEUMO-ABEX, LLC, as successor-in-interest to Abex Corporation, f/k/a American Brake Shoe Company; PORT AUTHORITY TRANSIT CORPORATION (PATCO); and RAILROAD

FRICTION PRODUCTS CORPORATION,
individually and d/b/a Cobra,

    Defendants-Respondents.

_____

Argued October 7, 2015 — Decided November 19, 2015

Before Judges Alvarez, Ostrer, and Manahan.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-5049-11.

Jeffrey P. Blumstein argued the cause for appellants (Szaferman, Lakind, Blumstein & Blader, P.C. and Levy Konigsberg, LLP, attorneys; Robert E. Lytle, on the briefs).

Christopher R. Gibson argued the cause for respondent Delaware River Port Authority and Port Authority Transit Corporation (Archer & Greiner, attorneys; Mr. Gibson, of counsel and on the brief; Patrick M. Flynn, on the brief).

John C. Garde argued the cause for respondent Honeywell International Inc., f/k/a Allied Signal, Inc. as successor-in-interest to The Bendix Corporation (McCarter & English, LLP and Gibbons, P.C., attorneys; Debra M. Perry, Kim M. Catullo, and Ethan D. Stein, of counsel; Mr. Garde and Jean Patterson, on the brief).

Walter F. Kawalec, III, argued the cause for respondent Pep Boys — Manny Moe & Jack of Delaware, Inc. (Marshall Dennehey Warner Coleman & Goggin, attorneys; Paul Johnson, Lisa Only, and Mr. Kawalec, on the brief).

Reagan W. Simpson (Yetter Coleman LLP) of the Texas bar, admitted pro hac vice, argued the cause for respondent Pneumo Abex, LLC (Roy F. Viola, Jr. (Hawkins Parnell Thackston & Young LLP), and Mr. Simpson,

A-3431-13T4

attorneys; Mr. Viola and Mr. Simpson, on the brief).

David J. Bird (Reed Smith LLP) of the Pennsylvania bar, admitted pro hac vice, argued the cause for respondent Railroad Friction Products Corporation (Bonner Kiernan Trebach & Crociata, LLP, attorneys; Mark A. Lockett, on the brief).

The opinion of the court was delivered by

ALVAREZ, P.J.A.D.

Plaintiffs, the Estate of Sandra Brust and Philip Brust, appeal from the summary judgment dismissal of their complaint. Sandra Brust (Brust) was diagnosed with mesothelioma in October 2010, and passed away from the disease while this litigation was pending. Plaintiffs allege Brust's father John Noga's employment from 1970 to 1977 as a train operator, yard operator, and supervisor with defendant Port Authority Transit Corporation (PATCO) resulted in take-home asbestos exposure leading to her illness.[1]

Noga's job duties included the repair and maintenance of air brake systems on PATCO's multiple unit (MU) locomotives.[2] In

---

[1] By virtue of an interstate compact between New Jersey and Pennsylvania, defendant Delaware River Port Authority (DRPA) owns the New Jersey tracks and right-of-way through which PATCO operates the high speed line between Lindenwold, New Jersey, and Philadelphia, Pennsylvania.

[2] In addition to PATCO and the DRPA, the "railroad defendants" include Railroad Friction Products Corporation (RFPC), which
(continued)

the process, asbestos dust would then be released into the air and land on his work clothes.  Upon returning home, Noga would play with his children, including Brust, who was born May 23, 1963, before changing or showering.

Additionally, plaintiffs claim Brust's mesothelioma may have been caused by her exposure to asbestos dust as Noga replaced automobile brakes on cars he worked on after hours.[3] Between 1963 and 1978, when the family moved to Georgia, Noga would buy an average of one used car per year, which he would repair for resale.

From 1970 to 1985, starting at about age seven, Brust would help her mother wash her father's clothes, including his PATCO uniform.  Brust's expert opined that she developed mesothelioma as a result of secondary exposure to friable asbestos fibers through direct contact with her father and while laundering his asbestos-laden clothes.

---

(continued)
distributed Cobra brand locomotive air brake shoes as well as Thyssenkrupp Budd Company (Budd) and Pneumo-Abex, LLC (Abex), among others.  RFPC supplied Budd with locomotive air brakes manufactured by RFPC; the replacement brake shoes were manufactured and supplied by Abex.  Both incorporate asbestos into their design.

[3] Included in these counts are the automotive defendants:  Pep Boys—Manny Moe and Jack of Delaware, Inc., Honeywell, formerly known as Allied Signal, Inc., successor-in-interest to The Bendix Corporation, and Abex as successor-in-interest of Abex Corporation, formerly known as American Brake Shoe Company.

In deciding the railroad defendants' motion for summary judgment, Judge Vincent LeBlon concluded that federal legislation and precedent preempt state tort claims related to locomotives. He rejected plaintiffs' argument that their claim was exempt from preemption because PATCO was not regulated by federal transportation agencies or regulations.

As to the automotive defendants, Judge LeBlon found that there was no evidence that Brust's contacts with automotive brake dust were sufficiently frequent, regular, and proximate to demonstrate causation. Thus, plaintiffs' proofs did not establish the elements of a prima facie case.

In sum, the judge granted the railroad defendants' motions for summary judgment as a matter of law. He granted summary judgment to the automotive defendants because, even when the facts were viewed in the light most favorable to plaintiffs, no genuine issue of material fact remained which could expose them to any liability. We affirm.

## I.

Rule 4:46-2(c) provides that summary judgment must be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is

entitled to a judgment . . . as a matter of law." The appropriate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail . . . ." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 533 (1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202, 214 (1986)).

On appeal, we review summary judgment orders de novo, utilizing the same standards applied by the trial courts. See Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 374 (2010).

## II.

Plaintiffs contend on appeal, as they did before the Law Division judge, that their state law claims against PATCO, DRPA, RFPC, and Abex, arising out of the design and manufacture of asbestos-contaminated locomotive brake shoes, were not preempted by federal law. The basis for their argument is that PATCO is an urban rapid transit operation, not a railroad, not subject to federal railroad safety regulations or to federal law generally.

### A.

A brief discussion of the doctrine of preemption is warranted. It arises from the supremacy clause, which states that federal law "shall be the supreme Law of the Land; and the

Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

"Where a state statute conflicts with, or frustrates, federal law, the former must give way." CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 663, 113 S. Ct. 1732, 1737, 123 L. Ed. 2d 387, 396 (1993). "The ultimate question is always whether Congress intended to preempt the subject matter of the state legislation." Chamber of Commerce v. State, 89 N.J. 131, 142 (1982); see also Comm. to Recall Robert Menendez from the Office of U.S. Senator v. Wells, 204 N.J. 79, 103 (2010) (discussing federal preemption). "Congress may preempt state common law as well as state statutory law through federal legislation." Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 77 (1990) (citing Chicago N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 325-26, 101 S. Ct. 1124, 1134, 67 L. Ed. 2d 258, 270 (1981)).

There are three categories of preemption: 1) express preemption as contained in the specific language of the federal law; 2) implied or "field preemption" where Congress has exclusively occupied the field of regulation; and 3) conflict preemption where state law conflicts with federal law. Kurns v. Railroad Friction Products Corp., ___ U.S. ___, 132 S. Ct. 1261, 1265-66, 182 L. Ed. 2d 116, 123 (2012); English v. Gen. Elec.

Co., 496 U.S. 72, 78-79, 110 S. Ct. 2270, 2275, 110 L. Ed. 2d 65, 74 (1990); R.F. v. Abbott Labs., 162 N.J. 596, 618 (2000); Dewey, supra, 121 N.J. at 77-78.

Field preemption, at issue here, occurs "where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it . . . ." Gonzalez v. Ideal Tile Imp. Co., 184 N.J. 415, 419 (2005) (quoting Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98, 112 S. Ct. 2374, 2383, 120 L. Ed. 2d 73, 84 (1992)), cert. denied, 546 U.S. 1092, 126 S. Ct. 1042, 163 L. Ed. 2d 857 (2006).

B.

Since 1926, it has been settled that in enacting the Locomotive Inspection Act (LIA), 49 U.S.C.A. §§ 20701-20703, Congress intended to occupy the entire field of locomotive equipment. Congress thereby preempted both state legislation that would affect the design, construction, and material of every part of the locomotive and its appurtenances, Napier v. Atl. Coast Line R.R. Co., 272 U.S. 605, 611, 47 S. Ct. 207, 209, 71 L. Ed. 432, 438 (1926), and state law tort claims for defective design of locomotive equipment, Kurns, supra, ___ U.S. at ___, 132 S. Ct. at 1265-66, 182 L. Ed. 2d at 123.

Preemption under the LIA "allows railroad carriers to abide by a single set of national equipment regulations, instead of having to meet different standards and, potentially, to change equipment when a train crosses state lines." Del. & Hudson R.R. Co. v. Knoedler Mfrs., Inc., 781 F.3d 656, 666 (3d Cir.), cert. denied, ___ U.S. ___, ___ S. Ct. ___, 193 L. Ed. 2d ___ (2015).

> This broad preemptive sweep is necessary to maintain uniformity of railroad operating standards across state lines. Locomotives are designed to travel long distances, with most railroad routes wending through interstate commerce. The virtue of uniform national regulation "is self-evident: locomotive companies need only concern themselves with one set of equipment regulations and need not be prepared to remove or add equipment as they travel from state to state."
>
> [Law v. Gen. Motors Corp., 114 F.3d 908, 910 (9th Cir. 1997) (quoting S. Pac. Transp. Co. v. Pub. Util. Comm'n, 9 F.3d 807, 811 (9th Cir. 1993)).]

C.

The LIA, originally enacted in 1911 as the "Locomotive Boiler Inspection Act" (BIA),[4] provides that:

---

[4] The BIA was enacted in 1911 when railroads used steam engines and initially applied only to "boilers and appurtenances thereto," but in 1915 was amended to "include the entire locomotive and tender and all parts thereof." Napier, supra, 272 U.S. at 608, 47 S. Ct. at 208, 71 L. Ed. at 437.

A-3431-13T4

A railroad carrier[5] may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances—

(1) are in proper condition and safe to operate without unnecessary danger of personal injury;

(2) have been inspected as required under this chapter . . . and regulations prescribed by the Secretary of Transportation under this chapter . . .; and

(3) can withstand every test prescribed by the Secretary under this chapter . . . .

[49 U.S.C.A. § 20701.]

An interstate railroad carrier has an absolute duty under the LIA to maintain the parts and appurtenances of its locomotives in safe and proper condition. Lilly v. Grand Trunk W. R.R. Co., 317 U.S. 481, 485, 63 S. Ct. 347, 351, 87 L. Ed. 411, 415 (1943). The "prime purpose" of the LIA is "the protection of railroad employees and perhaps also of passengers and the public at large . . . from injury due to industrial accident." Urie v. Thompson, 337 U.S. 163, 191, 69 S. Ct. 1018, 1035, 93 L. Ed. 1282, 1304 (1949).

The Secretary of Transportation (Secretary), pursuant to the LIA, has the authority to regulate the design and inspection of all locomotive parts, including air brake systems. The

---

[5] A "railroad carrier" is defined as "a person providing railroad transportation." 49 U.S.C.A. § 20102(3).

Secretary has promulgated highly detailed regulations establishing air brake system calibration, maintenance, and testing, 49 C.F.R. § 229.29 (2015), 49 C.F.R. § 238.309 (2015), and safety and design, 49 C.F.R. §§ 229.46 to 229.59 (2015). Federal regulations define a locomotive and also define an MU locomotive. 49 C.F.R. § 229.5 (2015). The federal railroad safety laws, including the LIA, apply only to "railroads." 49 U.S.C.A. § 20101. The term "railroad" is not defined in the LIA, but is defined by federal regulation, 49 C.F.R. 229.5 (2014), in accord with the Federal Railroad Safety Act (FRSA), 49 U.S.C.A. §§ 20102 to 20155,[6] to exclude "rapid transit operations within an urban area that are not connected to the general railroad system of transportation." "Urban rapid transit operations," such as the high speed line operated by PATCO, are not defined in the federal railroad safety statutes or regulations. See Chicago Transit Auth. v. Flohr, 570 F.2d 1305, 1311 (7th Cir. 1977) (Chicago Transit Authority is not a "railroad" as the term is used in the Railroad Safety Act of 1970 and thus not subject to Federal Railroad Administration (FRA) "railroad" regulations).

---

[6] FRSA contains a preemption provision, which provides that "[l]aws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable," but allows State law causes of action in limited circumstances. 49 U.S.C.A. § 20106. The LIA does not contain such a provision.

By delegation from the Secretary, the FRA enforces federal railroad safety statutes, including the LIA. 49 U.S.C.A. § 20702; 49 U.S.C.A. § 20103; 49 C.F.R. 229.1 (2015). The FRA has jurisdiction over all rail operations except rapid transit operations in an urban area that are not connected to the general railroad system of transportation. See 49 U.S.C.A. § 20102(2).

Urban rapid transit operations are not subject to federal regulations prescribing safety standards for locomotives and its appurtenances under the LIA, 49 C.F.R. §§ 229.3(b)(2), 229.5 (2015), or other federal safety regulations. See, e.g., 49 C.F.R. § 213.3(b)(3) (2015) (tracks); 49 C.F.R. § 215.5(f) (2015) (freight cars); 49 C.F.R. § 217.3(b)(2) (2015) (trains); 49 C.F.R. § 218.3(b)(2) (2015) (operating regulations); 49 C.F.R. § 219.5 (drug and alcohol use) (2015); 49 C.F.R. § 220.3(b)(2) (2015) (communication); 49 C.F.R. § 230.2(b)(3) (2015) (steam locomotives); and 49 C.F.R. § 232.3(c)(4) (2015) (brake systems for freight trains). The Federal Transit Administration (FTA), an agency of the United States Department of Transportation, has jurisdiction, under its rules governing "rail fixed guideway systems," over rapid transit systems not otherwise subject to FRA regulation.

Federal law requires a "state to oversee the safety and security of rail fixed guideway systems through a designated oversight agency." 49 C.F.R. § 659.1 (2014). A "rail fixed guideway system" is defined as "any light, heavy, or rapid rail system" not regulated by the FRA. 49 C.F.R. § 659.5 (2015). The New Jersey Department of Transportation (NJDOT) is this state's oversight agency. N.J.A.C. 16:53E-1.1. In fulfilling this responsibility, the NJDOT has adopted rules, regulations, and guidelines accomplishing that goal. It is undisputed that PATCO is an urban rapid transit operation subject in our state to general oversight by NJDOT.

### D.

The question plaintiffs raise is whether the LIA preempts state law claims arising from locomotive equipment even if the entity operating the equipment is "not subject to federal railroad regulations." We answer the question in the affirmative.

In our view, state law claims for defective design of the "locomotive equipment," and for failure to warn about its risks, fall within the field preempted by the LIA as defined in Napier, supra, 272 U.S. at 611, 47 S. Ct. at 209, 71 L. Ed. at 438. The preempted field is the subject of locomotive equipment, regardless of the entity using it. The notion was recently

14

reaffirmed in Kurns, supra, ___ U.S. at ___, 132 S. Ct. at 1265-66, 182 L. Ed. 2d at 123.

In Napier, the United States Supreme Court found a Georgia statute that required locomotives to have an automatic fire door, and a Wisconsin statute that required locomotives to have a cab curtain, were preempted by the LIA because the statutes were directed at the "equipment of locomotives." Napier, supra, 272 U.S. at 612, 47 S. Ct. at 210, 71 L. Ed. at 439. The LIA preempted "the entire field of regulating locomotive equipment," and the power delegated to the Interstate Commerce Commission (ICC), the predecessor to the FRA, extended "to the design, the construction and the material of every part of the locomotive and tender and of all appurtenances." Id. at 611, 47 S. Ct. at 209, 71 L. Ed. at 438.

The Court specifically rejected the states' contention that the scope of the preempted field was to "be determined by the object sought through the legislation," which was to promote the health and comfort of railroad engineers, "rather than the physical elements affected by it." Id. at 612, 47 S. Ct. 209, 71 L. Ed. 439. The federal and state statutes were "directed to the same subject -- the equipment of locomotives." Ibid. Thus, because the state laws, "however commendable or however different their purpose," operated on the same physical object

15                                                    A-3431-13T4

as the LIA, the laws fell in the preempted field. Id. at 613, 47 S. Ct. at 210, 71 L. Ed. at 439.

After the decision in Napier, Congress enacted various statutes amending the LIA, transferring the ICC's regulatory authority to the Department of Transportation, enacting the FRSA, and codifying all federal railroad statutes under Title 49. Congress did not alter the LIA's broad preemptive field.

A number of state courts since have held that the broad field preempts state tort law claims against manufacturers of locomotive equipment for injuries sustained by asbestos exposure. See Wright v. Gen. Elec. Co., 242 S.W.3d 674, 680 (Ky. Ct. App. 2007) (the LIA state common-law tort claims against locomotive manufacturers of brake shoes and other equipment are preempted under the LIA); Darby v. A-Best Prods. Co., 811 N.E.2d 1117, 1125-26 (Ohio 2004) (the LIA preempts state law tort claims against manufacturers of railroad locomotives for injuries caused by exposure to asbestos), cert. denied, 543 U.S. 1146, 125 S. Ct. 1297, 161 L. Ed. 2d 106 (2005); In re W. Va. Asbestos Litig., 592 S.E.2d 818, 824 (W. Va. 2003) (state law tort claims against manufacturers of parts or components of railroad locomotives are preempted by federal law under the LIA).

In 2012, the Court in _Kurns_ reaffirmed _Napier_. In _Kurns_ the decedent, George M. Corson, was a former locomotive repairman. Plaintiffs alleged he developed mesothelioma as a result of his exposure to asbestos while employed installing brake shoes on locomotives and stripping insulation from locomotive boilers. _Kurns_, _supra_, ___ U.S. at ___, 132 _S. Ct._ at 1264, 182 _L. Ed._ 2d at 122. The plaintiffs brought Pennsylvania state law tort claims for defective design and failure to warn against RFPC, and other manufacturers. _Ibid._ Coincidentally, RFPC is a defendant in this case, and the manufacturer and distributor of Cobra brand locomotive brake shoes containing asbestos.

In _Kurns_, the Court reaffirmed the breadth of the preempted field established in _Napier_, holding that the plaintiffs' claims were preempted because they were directed at "the subject of locomotive equipment." _Id._ at ___, 132 _S. Ct._ at 1270, 182 _L. Ed._ 2d at 128. The plaintiffs' defective-design claims were found to fall "within the pre-empted field because they would impose state-law requirements on a locomotive's physical makeup." _Id._ at ___, 132 _S. Ct._ at 1272, 182 _L. Ed._ 2d at 130 (Sotomayor, J., concurring in part, dissenting in part). In other words, the Court in _Kurns_ rejected the plaintiffs' attempt to redefine the preemptive field established in _Napier_, which

had constituted settled law for eighty-five years.  Id. at ___, 132 S. Ct. at 1268-69, 182 L. Ed. 2d at 125-27.

Significant to this appeal, the Court rejected the plaintiffs' argument that their state law claims against the manufacturers of locomotive equipment fell outside the LIA's preemptive field because the manufacturers were not subject to regulation under the LIA at the time the plaintiff was exposed to asbestos.[7]  Id. at ___, 132 S. Ct. at 1268-69, 182 L. Ed. 2d at 126-27.

The Court described that position as "inconsistent with Napier," because

> Napier defined the field pre-empted by the LIA on the basis of the physical elements regulated —— "the equipment of locomotives" —— not on the basis of the entity directly subject to regulation. . . .  Because petitioners' claims are directed at the equipment of locomotives, they fall within the pre-empted field.
>
> [Id. at ___, 132 S. Ct. at 1269, 182 L. Ed. 2d at 127 (emphasis added).]

The Court went on to state:

> Petitioners' proposed rule is also contrary to common sense. Under

---

[7] The LIA as originally enacted subjected only "common carriers" to civil penalties, but after the plaintiffs' exposure in Kurns, it was revised under the "Rail Safety Improvement Act of 1988," 102 Stat. 624 § 14, later repealed and recodified at 49 U.S.C.A. § 21303, to provide that an "act by an individual that causes a railroad carrier to be in violation is a violation."

petitioners' approach, a State could not require <u>railroads</u> to equip their locomotives with parts meeting state-imposed specifications, but could require <u>manufacturers</u> of locomotive parts to produce only parts meeting those state-imposed specifications. We rejected a similar approach in an express pre-emption context in <u>Engine [Manufacturers] Ass'n. v. South Coast Air Quality Management [District]</u>, 541 <u>U.S.</u> 246, 124 <u>S. Ct.</u> 1756, 158 <u>L. Ed.</u> 2d 529 (2004). There, a state entity argued that its rules prohibiting the purchase or lease of vehicles that failed to meet stringent emissions requirements were not pre-empted by the Clean Air Act, 42 <u>U.S.C.</u> §7543(a), because the rules in question were aimed at the purchase of vehicles, rather than their manufacture or sale. . . . We observed, however, that "treating sales restrictions and purchase restrictions differently for pre-emption purposes would make no sense," because the "manufacturer's right to sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them." <u>Id.</u> at 255, 124 <u>S. Ct.</u> 1756, 158 <u>L. Ed.</u> 2d 529. Similarly, a railroad's ability to equip its fleet of locomotives in compliance with federal standards is meaningless if manufacturers are not allowed to produce locomotives and locomotive parts that meet those standards. Petitioners' claims thus do not avoid pre-emption simply because they are aimed at the manufacturers of locomotives and locomotive parts.

[<u>Ibid.</u>]

Accordingly, the Court concluded that the LIA preempts state tort claims based on injuries caused by exposure to asbestos used in locomotive brake shoes even if the manufacturers were not subject to the LIA regulation. <u>Ibid.</u>

The Court in <u>Kurns</u> also rejected plaintiffs' argument that their claims did not fall within the preemptive field because they arose out "of the repair and maintenance of locomotives," as opposed to the "use of locomotives on a railroad line." <u>Id.</u> at ___, 132 <u>S. Ct.</u> at 1267, 182 <u>L. Ed.</u> 2d at 125. The plaintiffs contended that "the scope of the field pre-empted by the LIA is coextensive with the scope of the Federal Government's regulatory authority under the LIA," which did "not extend to the regulation of hazards arising from the repair or maintenance of locomotives." <u>Ibid.</u>

Nonetheless, the Court refused to "redefine" the preempted field:

> In <u>Napier</u>, the Court held that Congress, in enacting the LIA, "manifest[ed] the intention to occupy the entire field of regulating locomotive equipment," and the Court did not distinguish between hazards arising from repair and maintenance as opposed to those arising from use on the line. . . . The pre-empted field as defined by <u>Napier</u> plainly encompasses the claims at issue here. <u>Petitioners' common-law claims for defective design and failure to warn are aimed at the equipment of locomotives. Because those claims "are directed to the same subject" as the LIA, Napier dictates that they fall within the pre-empted field</u> . . . .
>
> [<u>Id.</u> at ___, 132 <u>S. Ct.</u> at 1267-68, 182 <u>L. Ed.</u> 2d at 125-26 (emphasis added).]

Finally, the Court rejected the plaintiffs' argument that their failure-to-warn claims did not fall within the preempted field because the basis for liability was the failure to provide adequate warnings, not the design of the product. <u>Id.</u> at ___, 132 <u>S. Ct.</u> at 1268, 182 <u>L. Ed.</u> 2d at 126.

On this point, the Court said:

> A failure-to-warn claim alleges that the product itself is unlawfully dangerous unless accompanied by sufficient warnings or instructions. <u>Restatement (Third) of Torts: Products Liability</u> §2(c) (1997) (A failure-to-warn claim alleges that a product is defective "when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, . . . and the omission of the instructions or warnings renders the product not reasonably safe"); <u>see also id.</u>, Comment l, at 33 ("Reasonable designs and instructions or warnings both play important roles in the production and distribution of reasonably safe products"). Thus, the "gravamen" of petitioners' failure-to-warn claims "is still that [Corson] suffered harmful consequences as a result of his exposure to asbestos contained in locomotive parts and appurtenances." . . . . Because petitioners' failure-to-warn claims are therefore directed at the equipment of locomotives, they fall within the pre-empted field defined by <u>Napier</u>, <u>supra</u>, 272 <u>U.S.</u> at 612, 47 <u>S. Ct.</u> 207, 71 <u>L. Ed.</u> 432.
>
> [<u>Id.</u> at ___, 132 <u>S. Ct.</u> at 1268, 182 <u>L. Ed.</u> 2d at 126.]

A-3431-13T4

Here, it is undisputed that PATCO's MU locomotives, supplied by Budd, were "locomotives" as defined in 49 C.F.R. § 229.5 (2015), which ran on standard gauge track — the gauge on which most railroads, including Amtrak, operate. Moreover, it is undisputed that the "locomotive equipment" at issue — the locomotive air brake shoes installed on PATCO locomotives — were designed and manufactured as components of a locomotive air brake system, designed for use on locomotives operated by railroad carriers subject to regulation under the LIA. See 49 C.F.R. 232.5 (2015) ("Air brake means a combination of devices operated by compressed air, arranged in a system, and controlled manually, electrically, electronically, or pneumatically, by means of which the motion of a railroad car or locomotive is . . . arrested"). See also Perry v. A.W. Chesterton, Inc., 985 F. Supp. 2d 669, 675-76 (E.D. Pa. 2013) (the plaintiff's state law claims pertaining to exposure to asbestos-containing brake shoes located on railcars are preempted under the LIA). In fact, the locomotive equipment was physically indistinguishable from the equipment in Kurns — that is, Cobra brand locomotive air brake shoes manufactured by RFPC and designed for the air brake system of a locomotive capable of travelling on a standard gauge track.

Because plaintiffs' negligence and products liability claims are directed at "the subject of locomotive equipment," they are therefore preempted under the sweeping field preemption adopted in Napier, and reaffirmed in Kurns. Plaintiffs' claims are preempted as state actions that would affect "the design, the construction, and the material" of locomotives, including claims for failure-to-warn. Kurns, supra, ___ U.S. at ___, 132 S. Ct. at 1267, 182 L. Ed. 2d at 124.

That the locomotive equipment operated by PATCO was a rapid transit operation not subject to the LIA regulation does not undercut the analysis. Kurns defines the preempted field as the locomotive equipment, not by the entity that purchases or uses the equipment. Id. at ___, 132 S. Ct. at 1267-68, 182 L. Ed. 2d at 125. In Kurns, the preempted field was not coextensive with the scope of the federal government's regulatory authority under the LIA. But that fact was found to be irrelevant to the application of the preemption doctrine. Id. at ___, 132 S. Ct. at 1267-69, 182 L. Ed. 2d at 125-27.

This broad field of preemption ensures uniformity of railroad equipment, an important safety and practical consideration given the national distribution of products manufactured for use in the industry. Focusing on equipment, as was the case in Napier and Kurns, ensures that all locomotive

equipment, regardless of where or by which entity it is used, meets federal safety standards. Creating an exception based on the classification of the operation at the time of the injury would conflict with the conclusions in <u>Kurns</u>, would threaten uniformity, and would complicate the straightforward equipment preemption that has remained unchanged since 1926. We therefore reject plaintiffs' argument that because PATCO's operations were not subject to federal regulation, their state court claims should survive.

Motions for summary judgment should be granted where, as a matter of law, the moving party is clearly entitled to judgment. In this case the railroad defendants must prevail because Congress exclusively occupies the field including the manufacture of locomotive brakes. We therefore hold plaintiffs' state claims are preempted by federal law, and do not reach plaintiffs' additional claims of error as to the railroad defendants.[8]

---

[8] This broad preemptive field leaves plaintiffs without a remedy, however, until Congress amends the LIA we are powerless "to prevent such an injustice." <u>See</u> <u>Craner v. Cedar Rapids & Iowa City Ry.</u>, 395 <u>U.S.</u> 164, 167, 89 <u>S. Ct.</u> 1706, 1708, 23 <u>L. Ed.</u> 2d 176, 180 (1969) (In the context of whether state-law defenses are available to a railroad being sued for injuries caused by its failure to adhere to the Federal Appliance Safety Act of 1893, 27 Stat. 531, 45 U.S.C. § 2, the Court acknowledged the unfairness of barring a non-federal employee from the recovery that would have been available to a federal employee for
(continued)

Plaintiffs contend that the judge erred in ruling that plaintiffs did not present sufficient evidence of Brust's secondary exposure to asbestos-contaminated automobile brake shoes and in granting summary judgment to the automotive defendants on that basis. Again, we disagree.

In granting Honeywell's motion, the trial judge found:

> [Brust] testified that the first time she saw her father perform a brake job was around 1970 and the family moved from New Jersey to Georgia in 1978. Additionally, [] Noga testified that he performed approximately one brake job per year. [] giving [Brust] all favorable inferences the total number of exposures from all brake jobs utilizing various brake pad manufacturers performed by her father is eight.
>
> Furthermore, [Noga] when asked was unable to quantify the number of times he performed a brake job using brake products manufactured, sold, and/or distributed by Bendix [now Honeywell]. [] Noga's testimony lacks the specificity required by the standard outlined by the court in Sholtis [v. Am. Cyanamid Co., 238 N.J. Super. 8, 30-31 (App. Div. 1989)]. Therefore, Plaintiff has failed to submit evidence that would allow [] a reasonable jury to find that [] Brust was exposed to friable asbestos on a

_____

(continued)
performing the same work "in the same manner" as the non-federal employee, but added, "It is not permitted the Court to rewrite the statute." Id. at 167, 89 S. Ct. at 1708, 23 L. Ed. 2d at 180).

regular and frequent basis in close proximity to Defendant's product.

The judge granted Abex's motion for summary judgment, regarding its automobile brake shoes, on the same basis.

When the judge granted Pep Boys' motion for summary judgment,[9] he reiterated Brust's deposition testimony:

> that she witnessed her father perform brake jobs on the vehicles infrequently maybe [] once every two or three years. Therefore, given that the relevant time period for exposure was at most [eight] years, a reasonable inference would have been that [Brust] was present for approximately [two] to [three] brake jobs performed by her father.

It is undisputed that Brust assisted in washing her father's clothes. The judge opined, however, that even when viewing the facts in the light most favorable to her, nothing in the record established that her illness resulted from exposure during "Noga's use of asbestos containing brakes sold and/or distributed by Pep Boys."

In a products liability failure-to-warn case, a plaintiff must prove that: 1) the product was defective; 2) the defect existed when the product left the defendant's control; 3) the defect caused injury to a reasonably foreseeable user; and 4) the defect was the absence of warning that the product can

---

[9] This was actually a motion for reconsideration, as the original motion for summary judgment was denied.

potentially cause injury. <u>James v. Bessemer Processing Co.</u>, 155 <u>N.J.</u> 279, 296 (1998); <u>Coffman v. Keene Corp.</u>, 133 <u>N.J.</u> 581, 593-94 (1993).

In an asbestos failure-to-warn case, the plaintiff must also prove two types of causation:  product-defect and medical causation.  <u>Becker v. Baron Bros.</u>, 138 <u>N.J.</u> 145, 152 (1994); <u>Coffman</u>, <u>supra</u>, 133 <u>N.J.</u> at 594; <u>Hughes v. A.W. Chesterton Co.</u>, 435 <u>N.J. Super.</u> 326, 337 (App. Div.), <u>certif. denied</u>, 220 <u>N.J.</u> 41 (2014).

"Proof of direct contact 'is almost always lacking,' and need not be proven by direct evidence of asbestos exposure." <u>Hughes</u>, <u>supra</u>, 435 <u>N.J. Super.</u> at 344 (citation omitted) (quoting <u>James</u>, <u>supra</u>, 155 <u>N.J.</u> at 301).

Regardless, to establish medical causation, a plaintiff must demonstrate that the exposure to the defendant's asbestos products was a "substantial factor" in causing the disease. <u>James</u>, <u>supra</u>, 155 <u>N.J.</u> at 299.  New Jersey courts, as well as courts in a majority of other jurisdictions, <u>James</u>, <u>supra</u>, 155 <u>N.J.</u> at 302-04, look to the "frequency, regularity, and proximity" of exposure as pronounced in <u>Sholtis</u>, <u>supra</u>, 238 <u>N.J. Super.</u> at 28.  Assessment of those circumstances determines whether exposure to the defendant's asbestos-containing product was a "substantial factor" in causing the alleged injury.

Hughes, supra, 435 N.J. Super. at 337-38; Provini v. Asbestospray Corp., 360 N.J. Super. 234, 239 (App. Div. 2003).

Nonetheless, the frequency, regularity and proximity test "'is not a rigid test with an absolute threshold level necessary to support a jury verdict.'" James, supra, 155 N.J. at 302 (quoting Tragarz v. Keene Corp., 980 F.2d 411, 420 (7th Cir. 1992)). "The phraseology should not supply 'catch words' [and] the underlying concept should not be lost." Sholtis, supra, 238 N.J. Super. at 29.

We held in Sholtis that "a plaintiff only need produce evidence from which a fact-finder, after assessing the proof of frequency and intensity of plaintiff's contacts with a particular manufacturer's friable asbestos, could reasonably infer toxic exposure." Ibid. "Under this test, plaintiff cannot rest on evidence which merely demonstrates that a defendant's asbestos product was present in the workplace or that he had 'casual or minimal exposure' to it." Kurak v. A.P. Green Refactories Co., 298 N.J. Super. 304, 314 (App. Div.) (quoting Goss v. Am. Cyanamid, Co., 278 N.J. Super. 227, 236 (App. Div. 1994)), certif. denied, 152 N.J. 10 (1997).

Thus, in order to prove medical causation in this matter, plaintiffs must provide sufficient evidence from which a reasonable jury could infer that from 1970 to 1978, Brust was

exposed to asbestos-contaminated brakes manufactured by Honeywell and Abex, and sold by Pep Boys, frequently, regularly, and while she was in close proximity to those products. Viewing plaintiffs' evidence in the most favorable light, a jury could find that Noga replaced the brake shoes on eight cars from 1970 to 1978, and that both the old brake shoes, about which nothing is known, and the new brakes shoes were contaminated with asbestos. During those eight years, Brust was exposed to asbestos through contact with her father while he handled asbestos-contaminated brake shoes on at most four occasions, and through washing his clothes on at most eight occasions.

Although Noga purchased most of the brake shoes from Pep Boys, he could not recall the names of the manufacturers of the replaced brake shoes, where most of the dust originated. He could not quantify the number of times he installed new Abex, Bendix, or Raybestos[10] brake shoes.

Plaintiffs contend from this testimony that "the evidence would only support a finding that one set of brakes Noga purchased at Pep Boys was manufactured by Honeywell's predecessor, Bendix, and one other set by Abex." And it is

---

[10] Raymark Industries, Inc., a manufacturer of asbestos-contaminated automotive brakes, filed a Chapter 11 bankruptcy petition in 1998, and is not named as a defendant in this case. In re Raytech Corp., 261 B.R. 350, 353 (Bankr. D. Conn. 2001).

undisputed that mesothelioma can develop from minimal exposure to asbestos. But the exposures established by this record are so few and so limited that they simply fail to meet the "frequency, regularity, and proximity" test.

That test was satisfied in <u>Olivo v. Owens-Illinois, Inc.</u>, 186 <u>N.J.</u> 394, 399 (2006), for example, where the plaintiff alleged she developed mesothelioma as a result of laundering her husband's asbestos-laden work clothes over a forty-year period. Similarly, in <u>Anderson v. A.J. Friedman Supply Co.</u>, 416 <u>N.J. Super.</u> 46, 54 (App. Div. 2010), <u>certif. denied</u>, 205 <u>N.J.</u> 518 (2011), we found summary judgment should not be granted where the plaintiff developed mesothelioma from laundering her husband's asbestos-laden work clothes over a thirty-year period. And, in <u>Kurak</u>, <u>supra</u>, 298 <u>N.J. Super.</u> at 310, 321-22, sufficient proofs were established by the plaintiff's work as a laboratory technician in close proximity to asbestos-contaminated pipe insulation for at least thirteen years.

Hence, we agree with Judge LeBlon that even if Brust was exposed to one of each of the automotive defendants' products over an eight-year period, assuming they were sold by Pep Boys, she failed to establish sufficient contacts to meet the frequency, regularity, and proximity test. <u>See, e.g.</u>, <u>Chavers v. Gen. Motors Corp.</u>, 79 <u>S.W.</u>3d 361, 370 (Ark. 2002) (one-time

exposure does not satisfy regularity and frequency test). There is no genuine issue as to any material fact. Viewing the circumstances in the light most favorable to plaintiffs, Brust's exposure lacked the requisite frequency, regularity, and proximity entitling the automotive defendants to summary judgment as a matter of law.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION