```
┌─────────────────────────────────────────────────────┐
│          NOT FOR PUBLICATION WITHOUT THE            │
│          APPROVAL OF THE APPELLATE DIVISION         │
│                                                     │
│  This opinion shall not "constitute precedent or be binding upon any court."│
│  Although it is posted on the internet, this opinion is binding only on the │
│    parties in the case and its use in other cases is limited. R. 1:36-3.    │
└─────────────────────────────────────────────────────┘
```

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4530-14T2

DONNA ROWE, individually and
as Executrix and Executrix
ad Prosequendum of the Estate
of RONALD ROWE,

    Plaintiff-Appellant,

v.

BELL & GOSSETT COMPANY, a
subsidiary of ITT Industries;
BORG WARNER MORSE TEC, f/k/a
Borg Warner; BRYANT
MANUFACTURING, n/k/a Carrier
Corp.; BURNHAM LLC, individually
and as successor to Burnham
Corporation, individually and as
successor-in-interest to Federal
Boiler and Radiator Co.; CRANE
CO., individually and as
successor to Jenkins Valves, Inc.,
a/k/a Jenkins Bros.; CRANE
PUMPS & SYSTEMS, INC.; DANA
COMPANIES, LLC f/k/a Dana
Corporation, individually and as
successor-in-interest to Victor
and Spicer; ECR INTERNATIONAL,
INC., as successor-in-interest
to Dunkirk Radiator Corporation;
GENERAL ELECTRIC COMPANY;
GENERAL PLUMBING SUPPLY, INC.,
as successor-in-interest to
Ridgewood Corp.; HB SMITH CO.,
INC.; HONEYWELL INTERNATIONAL,

INC., f/k/a Allied Signal, Inc., as successor-in-interest to The Bendix Corporation; J.H. FRANCE REFRACTORIES COMPANY; JOHNSON CONTROLS, INC., individually and as successor-in-interest to York International Corp.; LENNOX FURNACE CO., a/k/a Lennox Industries; NUTLEY HEATING & COOLING SUPPLY COMPANY; PEERLESS INDUSTRIES, INC., f/d/b/a Peerless Heater Co.; RIDGEWOOD CORP.; SID HARVEY INDUSTRIES, INC.; TRANE US, INC., as successor to American Standard Inc.; UNION CARBIDE CORP.; WEIL-MCLAIN COMPANY, INC.; COMPUDYNE CORPORATION, individually and as Successor to York-Shipley; NEW JERSEY PLUMBING GROUP, LLC, d/b/a Blackman Plumbing Supply Company, Inc., as successor-in-interest to Orange County Plumbing Supply Company and Ridgewood Corporation; ORANGE COUNTY PLUMBING GROUP, LLC, as successor-in-interest to Orange County Plumbing Supply Co. and Ridgewood Corporation; YORK INTERNATIONAL, INC.,

     Defendants,

and

HILCO, INC., as successor-in-interest to Universal Engineering Co., Inc.,

     Defendant-Respondent.

Argued February 14, 2018 — Decided  June 29, 2018

A-4530-14T2

Before Judges Alvarez, Nugent, and Geiger.

On appeal from Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-2353-14.

Amber R. Long argued the cause for appellants (Szaferman, Lakind, Blumstein & Blader, PC, and Levy Konigsberg, LLP, attorneys; Robert E. Lytle and E. Elizabeth Sweetser, on the briefs).

Patricia M. Henrich argued the cause for respondent (Reilly, Janiczek, McDevitt, Henrich & Cholden, PC, attorneys; Patricia M. Henrich, Brandy L. Harris and Josette F. Spivak, on the briefs).

McCarter & English, LLP, and Gibbons, PC, attorneys for amicus curiae Honeywell International, Inc. (John C. Garde, of counsel and on the joint briefs; Kim M. Catullo and Ethan D. Stein, of counsel; Christopher Rojao and Elizabeth Monahan, on the joint briefs).

Caruso Smith Picini, PC, attorneys for amici curiae Union Carbide Corporation and CertainTeed Corporation (Richard D. Picini and Anthony J. Caruso, on the joint briefs).

Eckert Seamans Cherin & Mellot, LLC, attorneys for amici curiae A.O. Smith and Superior Lindgerwood Mundy (David Katzenstein, on the joint briefs).

Marshall Dennehey Warner Coleman & Goggin, attorneys for amici curiae Kaiser Gypsum Company, Riley Power, Jaeger Lumber and Supply Company (Paul C. Johnson, on the joint briefs).

Pascarella DiVita, PLLC, attorneys for amici curiae Ingersoll Rand Company, Trane US, Inc., General Cable Corporation, and Rheem

Manufacturing Company (Lisa M. Pascarella and Stephanie A. DiVita, on the joint briefs).

Reilly, Janiczek, McDevitt, Henrich & Cholden, PC, attorneys for Amicus Curiae Aurora Pump Company (Patricia M. Henrich and Brandy L. Harris, on the joint briefs).

Tannenbaum Keale, attorneys for amici curiae BorgWarner Morse TEC LLC, Foster Wheeler LLC, survivor to a merger with Foster Wheeler Corporation and Foster Wheeler Energy Corporation (Christopher J. Keale, on the joint briefs).

Lynch Daskal Emery, LLP, attorneys for amicus curiae Georgia-Pacific LLP (Diane M. Pompei, on the joint briefs).

McElroy, Deutsch, Mulvaney & Carpenter, LLP, attorneys for amici curiae Burnham LLC and Eaton Corporation (Nancy McDonald, on the joint briefs).

McGivney & Kluger, attorneys for amici curiae Ductmate Industries, The Fairbanks Company, Herman Sommer, and Magid Glove and Safety (Thomas McNulty, on the joint briefs).

PER CURIAM

Donna Rowe (plaintiff), individually on her per quod claim and as executrix and executrix ad prosequendum of the estate of Ronald Rowe (Rowe), appeals an April 27, 2015 judgment of $304,152.70 plus prejudgment interest. We reverse and remand for a new trial on the issue of apportionment.

I.

Rowe died of mesothelioma on April 8, 2015, weeks after the jury verdict being appealed. The complaint originally named twenty-seven defendants, including Hilco Inc., the successor-in-interest to Universal Engineering Co., Inc. (Universal). Twelve defendants were granted summary judgment, four were dismissed, and two never appeared and the claims against them were abandoned.

Eight defendants settled their claims before trial, namely: (1) Borg Warner Morse Tec (Borg Warner); (2) Burnham, LLC (Burnham); (3) Dana Companies, LLC (Dana); (4) ECR International, Inc. (ECR); (5) Honeywell International, Inc. (Honeywell); (6) Peerless Industries, Inc. (Peerless); (7) Trane US, Inc. (Trane); and (8) Weil-McLain Company, Inc. (Weil-McLain) (collectively, the settling defendants). The parties signed stipulations of dismissal as to Trane on November 21, 2014, as to Honeywell on February 17, 2015, and as to ECR on June 23, 2015. A stipulation of dismissal as to Peerless was filed months later, and as to Borg Warner, Burnham, Dana, and Weil-McLain, months after that.

Only Universal participated in the trial. The company had cross-claimed for contribution against all co-defendants under the Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1 to -5, and

the New Jersey Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to -5.8 (Act).

The jury found that Rowe's exposure to a product sold or distributed by Universal was a substantial factor in causing his mesothelioma. The jury awarded compensatory damages of $1.5 million, allocated (1) $250,000 to Rowe for damages until the time of trial, (2) $500,000 to Rowe for future damages, (3) $250,000 to plaintiff for past loss of services and consortium, and (4) $500,000 to plaintiff for future loss of services and consortium.

The jury also found that Rowe's exposure to the products of the settling defendants was a substantial factor in causing his mesothelioma. The jury allocated twenty percent of the damages to Universal and apportioned the remaining eighty percent between the settling defendants as follows: (1) five percent to Borg Warner; (2) fourteen percent to Burnham; (3) six percent to Dana; (4) nine percent to ECR; (5) fourteen percent to Honeywell; (6) twelve percent to Peerless; (7) ten percent to Trane; and (8) ten percent to Weil-McLain. The judge denied plaintiff's motion for judgment notwithstanding the verdict and for a new trial.

Rowe, who was born on July 30, 1931, worked as an automobile mechanic for a couple of years in the early 1950s. From 1954 until 1985, however, he worked on heating equipment, furnaces, and new boilers. In the early 1960s, he established a business installing, repairing, and servicing boilers. Rowe operated that business until 1985 when he became disabled. Plaintiff testified that he came home from work every day with grayish dust on his clothes. Rowe was diagnosed with mesothelioma in February or March 2014.

It is not disputed that Rowe was repeatedly exposed to asbestos-containing dry furnace cement over three decades. That cement, intended for use on various types of boilers and furnaces, had to be mixed with water to create a paste. It was sold in fifty-pound bags. Rowe testified that he used Universal cement throughout his career both before and while in business, and estimated he used approximately 1000 bags of the product.

Rowe generated dust when he mixed the cement. He used the paste to seal exhaust pipes, burners, and other boiler and furnace components to make them air-tight. All the new asbestos cement that he used for the sealing work he performed hundreds of times was bought from Universal.

During regular cleaning and repair work, Rowe also generated dust when he removed hardened cement. Typically, this hardened cement was manufactured by Universal as he had applied it during earlier service calls for regular customers.

In the course of replacing boilers, Rowe would sometimes disassemble an old unit. This too created asbestos dust. He had no knowledge where that asbestos dust originated. On occasion, he took apart boilers that were wrapped in chicken wire covered in asbestos cement. When Rowe removed a steam boiler, he would sometimes rip out pipe work covered with asbestos material. On a couple of occasions, he removed old pipe covering during jobs that did not involve removing a boiler.

Rowe recalled removing old boilers manufactured by Dunkirk, Weil-McLain, Burnham, and American Standard. He could not recall how often he removed these boilers or how many of them needed to be broken apart.

When installing new boilers, Rowe would sometimes have to disassemble the units "[b]ecause you couldn't get it in the basement otherwise." He installed new boilers by Dunkirk, American Standard, and Peerless. Rowe estimated that he dismantled Dunkirk and Peerless boilers about seventy or seventy-five times each, and American Standard about sixty or sixty-five times. He believed

that the material holding the boiler sections together contained asbestos.

Rowe also testified to asbestos exposure unrelated to his employment. He "did a lot of brake jobs; clutch jobs; gaskets, head gaskets, manifold gaskets." He did "at least a hundred" brake jobs from 1948 to the mid-1970s using Bendix brakes. He might have occasionally installed Delco brakes, but he bought Bendix about eighty percent of the time.

During Rowe's two years as an automobile mechanic in the early 1950s, he worked with five or six head gaskets manufactured by Victor. As a mechanic and later, on his own motor home, Rowe installed approximately two dozen intake manifold gaskets and about thirty-two exhaust manifold gaskets manufactured by Victor. The gaskets came packaged together in a kit, and Rowe believed that the dust on them was asbestos dust. In his answers to interrogatories, he said working on brakes, clutches, and gaskets generated asbestos-containing dust.

Plaintiff's expert opined that Rowe's mesothelioma was caused by his exposure to asbestos. All types of asbestos, including chrysotile, in her opinion, could cause the disease. She considered it an unsafe product in any circumstance, and stated that even a low level of exposure is capable of causing mesothelioma and that it has a long latency.

A-4530-14T2

In the expert's opinion, Rowe's use of Universal cement, containing chrysotile asbestos, was a substantial factor in causing his mesothelioma. She characterized his exposure as very substantial. Although on cross-examination she agreed that all of Rowe's contacts with asbestos were substantial contributing factors to his mesothelioma, she held to her conclusion that his use of Universal cement was the predominant exposure to asbestos contributing to his disease.

Universal's expert testified that chrysotile does not cause malignant mesothelioma at any dose. Although Rowe was exposed to asbestos from about 1000 pounds of Universal cement, he considered it to be "low level of cumulative exposure and [] not sufficient to put a — pose a risk for the development of malignant mesothelioma in this man." The expert believed more significant contacts with asbestos were required to cause malignant mesothelioma. In contrast with Rowe's expert, Universal's expert opined that Rowe's mesothelioma was caused by the thermal system insulating materials packaging the units with which he worked, rather than the Universal cement. He said Rowe's disease was caused by pipe covering material and possibly boiler covering insulation, because during the relevant time period, many were friable and contained amosite asbestos.

A second Universal expert also testified that Rowe's exposure from Universal products "was negligible, insignificant, <u>de minimis</u>, profoundly less exposure, a tiny fraction of exposure of what he would have received from working with pipe insulation and boiler work" because he used Universal cement in such small quantities over the years. His opinion was based on Rowe mixing Universal cement products, as opposed to exposure related to Rowe's removal and replacement of that product during annual service visits.

## III.

To support its demand for apportionment under the Act, Universal presented evidence to the jury establishing liability on the part of the eight settling defendants. At the start of the trial, Universal sought to have the settling defendants ruled unavailable for purposes of admission of certain answers to interrogatories and deposition transcripts.

Universal sent notices in lieu of subpoena to each of the eight, demanding the appearance of a corporate representative to provide testimony. Each notice stated that "the enclosed Notice in Lieu of Subpoena shall remain in effect in the event your client settles or is dismissed from the case."

Universal certified that none of the settling defendants would produce a witness at trial, despite the notices:

11

(1) Borg Warner.  Counsel for Borg Warner advised counsel for Universal by telephone that the company "is not located in New Jersey and therefore will not appear at trial voluntarily."

(2) Burnham.  Burnham's counsel emailed that "Burnham's corporate rep[resentative] does not live in NJ and will not be appearing at trial."

(3) Dana.  Company representatives "do not reside within this jurisdiction and thus are unavailable for the purposes of providing testimony at trial."

(4) ECR.  Counsel for ECR wrote to counsel for Universal that "ECR's designated corporate representative works and resides in upstate New York" and "[d]ue to personal and business commitments," was "unavailable to travel to New Jersey for a personal appearance at trial of this matter."

(5) Honeywell.  Counsel for Honeywell in writing indicated that "Honeywell's corporate-representative-witness, Mr. Joel Cohen, resides in the State of California, and due to his being outside this jurisdiction, is 'unavailable' pursuant to the Court Rules and Rules of Evidence."

(6) Peerless.  Counsel for Universal confirmed by phone that "its representatives do not reside within this jurisdiction and thus are unavailable for the purposes of providing testimony at trial."

(7) Trane. Trane's counsel emailed that "we do not have any available witness with personal knowledge relevant to your request."

(8) Weil-McLain. Counsel "[d]uring a telephone conversation . . . confirmed that its representatives do not reside within this jurisdiction and thus are unavailable for the purposes of providing testimony at trial."

Plaintiff's counsel objected to the admission of the deposition of a representative of Borg Warner who had testified in a different Middlesex County matter, on the grounds that Universal had not proven the unavailability of the witness, and plaintiff was not present at his deposition. Counsel also argued that Universal "had not only the opportunity but the obligation to come to this [c]ourt to compel compliance with the notice in lieu of subpoena" served on Borg Warner.

Plaintiff's counsel raised essentially the same objection to the other settling defendants. Universal's counsel represented that "as it relates to unavailability . . . the history of the litigation is that, given the breadth of the asbestos litigation, the various jurisdictions, these corporate representatives typically are produced and they're produced in a few cases but not in every single case." The trial court accepted the representation

of counsel that the representatives were outside the jurisdiction of the court and unavailable.

During trial, Universal read sections of testimony from the depositions of corporate representatives of Borg Warner, Burnham, Dana, ECR, Peerless, and Weil-McLain. However, the trial court ultimately disallowed deposition readings from representatives of Honeywell and Trane because those two settling defendants were based in New Jersey and, thus, available to appear at trial. Defense counsel argued that the deposition testimony of Trane and Honeywell representatives was admissible under N.J.R.E. 803(b), even if they were available, because they were parties: "Although this defendant is not currently a party, they are a party—or not an active party. They're a party as to us. We have an active cross claim against them." The court disagreed, stating, "I read it to the contrary."

Plaintiff opposed Universal's application to read answers to interrogatories from the settling defendants, arguing that interrogatory answers were only admissible against parties and that the settling defendants were no longer parties even though Universal would be entitled to an offset of liability. The court held that, although the settling defendants were "not active" parties, Universal "may put in proofs as to those settled defendants provided that it has asserted cross-claims" against

14

them. The court allowed the admission of answers to interrogatories by the settling defendants, whether in the present case or another matter, as long as they were certified.

Based on these rulings, Universal read selected interrogatory answers of all eight settling defendants into the record. Some of the interrogatory answers had been served in the Rowe matter, some in other Middlesex County matters, and some in matters outside New Jersey.

In total, the interrogatory answers and deposition testimony excerpts that were allowed (collectively, the settling defendant evidence), provided the following facts regarding the settling defendants:

(1) Borg Warner sold, between 1928 and 1986, "[m]anual clutch assemblies incorporating clutch facings of others, some of which contained encapsulated chrysotile asbestos." It had "no information as to which of its automotive friction products, if any, were distributed or sold in New Jersey." Borg Warner's clutch facings never contained any warnings about the hazards of asbestos.

(2) Burnham manufactured residential boilers that contained asbestos-containing components, starting in the late 1930s or early 1940s and ending about 1985. Burnham boilers had no warning labels about the dangers of asbestos. The applicable installation

instructions called for the use of asbestos-containing cement to seal certain areas.

(3)  Dana became the successor in interest to the Victor Gasket and Manufacturing Company (Victor), which made "gasket products predominantly for use in passenger cars, trucks, off-high vehicles and leisure boat applications," only some of which contained asbestos.  The interrogatory answers Dana served in this matter stated:

> Victor Products Division made thousands of different gaskets for vehicular applications that varied in many ways, such as size, shape, and physical characteristics according to type of engine, size of engine, number of cylinders, make of engine, year, and model of engine.  Some, but not all, of the gaskets contained asbestos.

The earliest Dana placed any warning on an asbestos-containing product was 1984.

(4)  ECR was the successor in interest for Dunkirk, which manufactured "[s]ectional cast iron boilers, residential."  From 1928 until sometime in the 1980s, these boilers contained asbestos rope, flat asbestos fiber gaskets, and asbestos insulation.  In the initial decades, pieces of the boiler would be assembled at its destination and furnace cement applied after that.  By the mid-1960s, the boilers were typically "completely, fully

assembled, crated and shipped that way from the factory."  These boilers contained no asbestos warnings.

(5)  Honeywell was the successor in interest for Bendix, which manufactured "asbestos-containing friction products for automotive uses," including brake linings and disc brake pads that included chrysotile asbestos fibers.  These boxes had a warning on the hazards of asbestos from 1973 onward.

(6)  Peerless manufactured cast iron boilers "for residential and light commercial applications, some of which may have incorporated a small quantity of asbestos-containing materials."  It provided the following interrogatory answer in a different Middlesex County matter:

> No one model boiler used all of such components at any one time, and many never used any such component. In general, however, based upon the records and information presently available, Peerless believes that between the 1930's and early 1980's, some models of boilers sold under the Peerless name may have included millboard, which was completely encapsulated and enclosed in cast iron jackets, asbestos rope or gaskets which were compressed between boiler sections to create a tight seal, and asbestos cement, which, at times, may have been used in conjunction with the rope to prevent a carbon monoxide leak from the seal between the sections.

Peerless supplied pre-cut pieces of asbestos rope in the 1960s and 1970s for use with boiler installation.  Use of the rope was phased

out about 1983. Peerless also supplied cement for use in installation, which might have been wet or a dry mix. Peerless boilers had no warnings about asbestos.

(7) Trane was successor in interest to American Standard, which "manufactured a line of heating products, low pressure cast iron boilers, flash burners, and furnaces for use in residential and smaller commercial, institutional and industrial settings." As explained in interrogatory answers:

> American Standard built and shipped smaller units from the factory as complete packaged units. Larger boilers were shipped in sections for assembly and jacketing in the field.
>
> American Standard boilers were specially machined so that they did not require rope or gasket to seal between the cast iron sections.

Trane acknowledged that, over the course of ninety years, American Standard manufactured products using "components manufactured by third parties," and that, "[d]uring limited times, some of these components may have had internal parts manufactured by these third parties, that contained encapsulated chrysotile asbestos fibers." American Standard provided no warnings regarding asbestos.

(8) Weil-McLain, from the 1920s onward, manufactured "small cast iron gas, oil and electric boilers for use in residential and commercial settings," some of which contained asbestos-containing products. Weil-McLain boilers used wet asbestos cement, asbestos

rope, gaskets and asbestos-containing millboard liners. Most of these parts were manufactured by third parties and, for the convenience of customers, were shipped with Weil-McLain boilers for use in installation. No warnings about asbestos were on the boilers.

At the close of Universal's case, plaintiffs (referring to Rowe and plaintiff) moved to dismiss Universal's claims against the settling defendants under the Act, contending that no sufficient basis for allocation had been established. The court rejected plaintiffs' allocation argument, stating:

> No, the [c]ourt is satisfied because the—
> although there—you know, one could contend
> that there were no expert proofs to assist the
> jury on allocations, there were factual proofs
> that were presented, and it ultimately will
> be up to the jury to determine whether they
> are sufficient. So that application is
> denied.

Plaintiff raises the following points on appeal:

POINT I
THE TRIAL COURT ERRED IN ALLOWING THE NON-SETTLING DEFENDANT, UNIVERSAL, TO INTRODUCE ANSWERS TO INTERROGATORIES AND TESTIMONY OF THE SETTLING DEFENDANTS FROM PRIOR PROCEEDINGS BECAUSE SUCH EVIDENCE IS HEARSAY THAT DID NOT FALL WITHIN ANY EXCEPTION TO THE RULE AGAINST HEARSAY.

A. THE INTERROGATORY ANSWERS AND TESTIMONY OF CORPORATE REPRESENTATIVES OF THE SETTLING DEFENDANTS WERE NOT ADMISSIBLE UNDER R. 4:16-1(B) OR N.J.R.E.

803(B)(1)(B) BECAUSE THEY WERE NO LONGER PARTIES AT THE TIME OF TRIAL.

B.    AT THE TIME OF TRIAL, UNIVERSAL WAS NO LONGER ADVERSE TO THE SETTLING DEFENDANTS AND THE INTERROGATORY ANSWERS AND TESTIMONY FROM PRIOR PROCEEDINGS WERE NOT USED AGAINST THE SETTLING DEFENDANTS, THEREFORE, NEITHER R. 4:16-1(B) NOR N.J.R.E. 803(B)(1)(B) WAS APPLICABLE.

C.    UNIVERSAL FAILED TO DEMONSTRATE THAT THE CORPORATE REPRESENTATIVES OF THE SETTLING DEFENDANTS WERE UNAVAILABLE PURSUANT TO N.J.R.E. 804(A) AND THE CASE LAW CONSTRUING THAT RULE.

POINT II
THE TRIAL COURT ERRED IN INSTRUCTING THE JURY, CONTRARY TO THE SUPREME COURT'S OPINION IN SHANKMAN V. STATE, 184 N.J. 187 (2005), THAT PLAINTIFF HAD "SETTLED" HIS CLAIMS WITH CO-DEFENDANTS AGAINST WHICH THE REMAINING DEFENDANT ASSERTED CROSS CLAIMS, THUS IMPLYING THAT THE SETTLING DEFENDANTS HAD ACKNOWLEDGED RESPONSIBILITY FOR PLAINTIFF'S MESOTHELIOMA.

POINT III
THE TRIAL COURT'S DENIAL OF PLAINTIFF'S JNOV MOTION RESULTED IN A CLEAR MISCARRIAGE OF JUSTICE.

A.    BOILER EXPOSURES.

    1.    ECR ("DUNKIRK")
        a.    SERVICE WORK
        b.    INSTALLATION WORK
        c.    REMOVAL WORK

    2.    WEIL MCLAIN
        a.    SERVICE WORK
        b.    INSTALLATION WORK
        c.    REMOVAL WORK

20

3.  BURNHAM
    a.  SERVICE WORK
    b.  INSTALLATION WORK
    c.  REMOVAL WORK

4.  PEERLESS
    a.  SERVICE WORK
    b.  INSTALLATION WORK
    c.  REMOVAL WORK

5.  TRANE ("AMERICAN STANDARD")

6.  CONCLUSION — BOILER EXPOSURES

B.  FRICTION EXPOSURES.

1.  BORG WARNER
2.  HONEYWELL (BENDIX)
3.  VICTOR (DANA)
4.  CONCLUSION — FRICTION
    EXPOSURES

C.  CONCLUSION.

## IV.

The trial judge erred in admitting the settling defendant evidence. It was not exempt from the general prohibition against admission of hearsay. We do not frame the issue in terms of "party" status: the question is whether the answers to interrogatories and depositions should have been admitted given the rules excluding hearsay, and the manner in which the judge resolved the question of witness unavailability. The answers to interrogatories were inadmissible because they were not offered against the settling defendants, regardless of whether they were still parties at the time of trial. The court decided the settling

defendants were unavailable merely because they declined to appear without having been released either by counsel or the court.

A.

In ruling, the trial judge did not identify the evidence or court rule that made certified interrogatory answers admissible. We presume she relied upon a combination of (1) Rule 4:17-8(a), which states that "[a]nswers to interrogatories may be used to the same extent as provided by . . . R. 4:16-1(b) for the use of the deposition of a party," and (2) Rule 4:16-1(b), which provides:

> The deposition of a party or of any one who at the time of taking the deposition was an officer, director, or managing or authorized agent, or a person designated under R. 4:14-2(c) or R. 4:15-1 to testify on behalf of a public or private corporation, partnership or association or governmental agency which is a party, may be used by an adverse party for any purpose against the deponent or the corporation, partnership, association or agency.

Assuming the trial court reasoned that the settling defendants, though "not active" parties, were nevertheless "adverse" to Universal and that the evidence was used "against" them, then the scope of the rulings were inconsistent with proper application of the rules.

Rule 4:17 applies to interrogatory answers given in the New Jersey matter being tried. Nothing in the court rules suggests that interrogatory answers from litigation pursued in various

A-4530-14T2

jurisdictions around the country fall within their scope. Plaintiff objected on these grounds, but the trial court held that any certified interrogatory answers could be admitted.

Universal contends that the settling defendant evidence, both interrogatory answers and deposition excerpts, was also admissible under N.J.R.E. 803(b)(1). That rule includes the statement of a "party opponent" among those "statements [] not excluded by the hearsay rule" if it is "offered against a party" and is "the party's own statement, made either in an individual or in a representative capacity."

If the settling defendant evidence was admissible under N.J.R.E. 803(b)(1), then interrogatory answers from around the country would be admissible. Indeed, if N.J.R.E. 803(b)(1) were applicable, then it would also apply to deposition testimony and the trial court should not have excluded the testimony of Trane and Honeywell representatives on the grounds that those New Jersey entities were available to appear.

Both Rule 4:16-1(b) and N.J.R.E. 803(b)(1) have the common prerequisite that statements within the scope of the rule must be offered "against" the statement-maker. Significantly, use of the evidence against the statement-maker is required, regardless of whether the statement-maker is, might be, or is not a party at the time of trial.

For example, if a Weil-McLain representative had stated in an interrogatory answer or at a deposition that the asbestos cement sold by Universal was frequently used by servicemen such as Rowe when installing and servicing Weil-McLain's boilers, that statement could not be admitted under either Rule 4:16-1(b) or N.J.R.E. 803(b)(1)(B) because it would be a statement against Universal rather than the statement-maker, Weil-McLain. This would be true regardless of whether Weil-McLain settled or was present and participating at the trial.

At the time of trial, the settling defendants' claims were fully resolved. They had nothing to gain or lose from the outcome of the trial or any possible apportionment of liability. Universal had no right to any possible future recovery from the settling defendants, regardless of how well it carried its burden of proof. Rather, Universal stood to gain only a reduction in the damages it might ultimately owe as a result of the trial of plaintiffs' claims against it.

Plaintiff, on the other hand, stood to lose a significant portion of the jury's quantum of damages if the jury accepted the settling defendant evidence from Universal as minimizing its responsibility. The only affirmative claim presented to the jury and resolved by the jury's verdict was plaintiff's claim against Universal, and the jury's decisions as to the settling defendants

24

were significant only because they impacted that claim. Universal could maximize the impact of that evidence while leaving plaintiff little recourse. In these circumstances, the settling defendant evidence was offered only against the plaintiff.

All of the parties, for different reasons, rely on Young v. Latta, 123 N.J. 584 (1991). The Young Court held that, when a plaintiff settles with a defendant in a multi-defendant case, "the court should dismiss a non-settler's cross-claim for contribution as a matter of law as a result of the settlement, although the credit survives." Id. at 591 (citing Tefft v. Tefft, 192 N.J. Super. 561, 570 (App. Div. 1983)).

Plaintiff argues this holding "makes clear" that a settling defendant "is no longer a party to the action." Universal argues that, to the contrary, because the Young Court "recognized a defendant's fundamental right to obtain a credit pursuant to the [Act]," plaintiff's assertion that the hearsay rule bars admission of the settling defendant evidence "flies in the face of both the Young decision and the [Act]." The amici curiae contend that plaintiff "misquote[s] and mischaracterize[s]" the Young decision and that the holding that "credit survives" dismissal necessitates a finding that a settling defendant remains a party to the action.

Young, however, does not address the specific evidentiary issue presented here. The Court held that a credit under the Act

A-4530-14T2

survives even though the non-settling defendants' cross-claims are dismissed. <u>Young</u>, 123 N.J. at 599. This supports the proposition that, at trial, the non-settling defendant's evidence is offered against the plaintiff rather than against any settled defendants.

Similarly, Universal calls the court's attention to the recently decided case <u>Krzykalski v. Tindall</u>, 448 N.J. Super. 1, 4 (App. Div. 2016), <u>affirmed</u>, ___ N.J. ___ (2018), arguing that it undercuts plaintiff's contention that the settling defendants were no longer parties at the time of trial. Like <u>Young</u>, however, <u>Krzykalski</u> does not involve evidence issues, but simply reiterates a principle not in dispute, namely, that under the Act the jury should be "allowed to evaluate the liability of all those potentially responsible." <u>Id.</u> at 7.[1] Indeed, <u>Krzykalski</u> supports the conclusion that determining "party" status is ultimately irrelevant to the issues. <u>Ibid.</u> (noting that apportionment "is not governed by whether that tortfeasor may be said to be a 'party' but turns on whether the other tortfeasor 'will be affected by the verdict'" (citations omitted)).

Thus, Universal's repeated insistence that it retained cross-claims throughout trial and offered the settling defendant

---

[1] Our Supreme Court affirmed this principle. <u>Krzykalski</u>, ___ N.J. ___ (slip op. at 8-10).

evidence in support of those cross-claims ignores established law that its cross-claims ceased to exist when the other defendants settled with plaintiffs.  The settling defendant evidence went to the issue of a credit, not to establishing affirmative claims against the settling defendants.

Plaintiff cites to Guzzi v. Clarke, 252 N.J. Super. 361 (Law Div. 1991), in support of her position.[2]  Guzzi sued Clarke for damages resulting from an automobile accident.  Clarke, the driver of the other car, had been a defendant along with Guzzi in a consolidated action brought by a passenger in Clarke's car, Grander.  Id. at 366.  Both settled with Grander before trial.  Ibid.  Guzzi sought to admit the deposition testimony of Grander, arguing that it "should be admissible under R. 4:16-1(b) which provides that the deposition of a party is admissible."  Ibid.

The trial court ruled it was inadmissible "because the person whose deposition testimony is sought to be admitted as a party must be a party at the time of trial."  Id. at 367.  Explaining that Rule 4:16-1(b) was based on Evid. R. 63(7),[3] providing that

---

[2]  Plaintiff also cites to an unpublished Appellate Division case Buttitta v. Allied Signal, Inc., No. A-5263-07 (App. Div. Apr. 5, 2010).  We do not include the case in our discussion.  See R. 1:36-3.

[3]  N.J.R.E. 803(b)(1) replaced Evid. R. 63(7) and, while it made some language changes, it made "no substantive change" to the

"[a] statement made by a person who is a party to an action is admissible against him in that action," <u>Guzzi</u> holds that "Grander's deposition testimony could only be admissible against <u>her</u> in an action." <u>Ibid.</u> (alteration in original). Because she was no longer involved in the action, the hearsay exception was not applicable. <u>Ibid.</u> The deposition testimony was not admitted. <u>Ibid.</u>

Universal and the amici argue that <u>Guzzi</u> is distinguishable because, in that case, Guzzi sought to use Grander's testimony against Clarke, while here, Universal used the settling defendant's evidence against the settling defendants. As discussed above, however, because Universal had no cross-claims remaining by the time of trial, and only plaintiff's rights could be affected by jury apportionment, the evidence only affected plaintiff.

The amici cite <u>Brodsky v. Grinnell Haulers, Inc.</u>, 181 N.J. 102 (2004), and <u>Kearny v. Brandt</u>, 214 N.J. 76, 100 (2013), for the proposition that "a defendant who settles and is dismissed from the action remains a 'party' to the case for the purpose of determining the non-settling defendant's percentage of fault." <u>Kearny</u>, 214 N.J. at 100 (quoting <u>Brodsky</u>, 181 N.J. at 113). These

---

scope of the rule. Biunno, Weissbard & Zegas, <u>Current N.J. Rules of Evidence</u>, cmt. 1 on N.J.R.E. 803(b)(1) (2018).

cases, however, like the Young case, addressed the specific issue of whether a former defendant remained a "party" solely for purposes of allocation under the Act, which requires a determination "in the form of a percentage, of each party's negligence or fault." N.J.S.A. 2A:15-5.2(a)(2). The cases do not deal with the evidence rules.

Universal asserts that since plaintiff had planned to use the settling defendants' evidence against it if they had not settled, it would be unfair to prevent Universal from using the same evidence. Similarly, the amici argue that "it would be prejudicial to the trial defendant to require it to attempt to present its cases against the settling defendants without the full advantage of the court rules and evidence that it would have enjoyed if the settling defendants had not, in fact, settled."

These arguments, however, ignore the rationale for allowing the admission of interrogatory answers or deposition testimony against the statement-maker. The statement-maker is present at trial and has a full and fair opportunity to counter, explain, or supplement any statements admitted. If, for example, Trane had remained a defendant at trial, it would have presented its own defense evidence, including perhaps an expert explaining (1) the limited circumstances in which asbestos contained within American Standard boilers would have become friable, (2) the significance

29

of friability to Rowe's exposure and disease, and (3) the likely quantity of friable asbestos generated by breaking down approximately sixty American Standard boilers, the number of units Rowe estimated he had disassembled. Such expert testimony, or other similar evidence, would have provided the jury with a fuller picture and could have led it to a different conclusion regarding Trane's liability or percentage of fault.

There is no unfairness in rules allowing a plaintiff the use of evidence against co-defendants who are present at trial, but precluding a defendant from using the same evidence against the plaintiff when those co-defendants settle and have no reason or opportunity to present any countervailing evidence. Allowing the admission of evidence by a defendant against the very party that crafted the evidence and can defend itself is qualitatively different than what Universal did here, which was to transform statements of settling defendants into unrebuttable admissions to be used against a party that did not make those admissions.

N.J.R.E. 803(c)(25) allows for the admission of a hearsay statement that, at the time of its making, "so far tended to subject declarant to civil . . . liability . . . that a reasonable person in declarant's position would not have made the statement unless the person believed it to be true." The declarant need not be a party for a statement against interest to be admissible. See,

<u>e.g.</u>, <u>Speaks v. Jersey City Hous. Auth.</u>, 193 N.J. Super. 405, 412-13 (App. Div. 1984).

Universal argues that statements by the settling defendants "concerning their sale of asbestos-containing products and their failure to warn with regard to those products" fall under this rule because such statements "would certainly tend to subject [the settling defendants] to civil liability." However, Universal's overly broad reading of the rule would allow for the admission of virtually any "negative" statement of fact. That a particular defendant manufactured or sold a product containing asbestos but did not warn about its hazards is only one piece of the much larger picture needed to establish liability. Moreover, the existence of asbestos-containing products and the absence of warnings are objective, well-known historical facts that the settling defendants could not avoid acknowledging in the face of incontrovertible proof.

Thus, the trial court erred in admitting the settling defendants' evidence under either <u>Rule</u> 4:16-1(b) or N.J.R.E. 803(b)(1). The error arose because Universal effectively offered hearsay evidence against plaintiff, not against the settling defendants. We cannot sufficiently stress that allowing the admission of this evidence transformed the statements of the

settling defendants into irrefutable admissions to be used against plaintiff, even though plaintiff did not make the statements.

V.

Plaintiff also contends Universal did not establish the "unavailability" of the six out-of-state settling defendants. Such proof is a prerequisite to admission of the corporate representative testimony under N.J.R.E. 804(a).

We review the trial court's decision regarding witness unavailability employing an abuse of discretion standard. Williams v. Hodes, 363 N.J. Super. 600, 605 (App. Div. 2003). The trial court's interpretation of the law, and the legal consequences that flow from established facts, are not entitled to any special deference. Manalapan Realty v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995) (citations omitted). The trial court failed to require that Universal demonstrate due diligence in ascertaining the unavailability of the settling defendants.[4]

N.J.R.E. 804(b) provides that certain testimony of witnesses from prior proceedings will not be excluded as hearsay "if the

---

[4] In the trial court, plaintiff also argued that Universal failed to demonstrate that the party taking depositions in the prior proceedings had an interest and motive similar to the plaintiff in this case, as required by N.J.R.E. 804(b)(1)(B). On appeal, this argument is only raised in a footnote and accordingly we will not consider it. See State v. Mays, 321 N.J. Super. 619, 636 (App. Div. 1999).

declarant is unavailable as a witness." N.J.R.E. 804(a) provides that a declarant is "unavailable" as a witness where that declarant:

> (1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the statement; or
>
> (2) persists in refusing to testify concerning the subject matter of the statement despite an order of the court to do so; or
>
> (3) testifies to a lack of memory of the subject matter of the statement; or
>
> (4) is absent from the hearing because of physical or mental illness or infirmity, or other cause, and the proponent of the statement is unable by process or other reasonable means to procure the declarant's attendance at trial, and, with respect to statements proffered under Rules 804(b)(4) and (7), the proponent is unable, without undue hardship or expense, to obtain declarant's deposition for use in lieu of testimony at trial.
>
> [N.J.R.E. 804(a).]

The trial court in this case ruled that (1) the unavailability of the corporate entity, rather than the individual representative witness, was the relevant inquiry, and (2) Universal established the unavailability of any corporate entity by merely asserting the settling defendant declined to testify voluntarily and was not based in New Jersey.

The party seeking to admit prior testimony under N.J.R.E. 804(b)(1) has the burden of demonstrating that the witness is unavailable. State, Dept. of Envtl. Prot. v. Standard Tank Cleaning Corp., 284 N.J. Super. 381, 400-01 (App. Div. 1995). Moreover, "the party offering the deposition [must] first demonstrate that there are no 'reasonable means to procure the declarant's attendance at trial.'" Witter by Witter v. Leo, 269 N.J. Super. 380, 391 (App. Div. 1994) (citation omitted); see also Avis Rent-A-Car v. Cooper, 273 N.J. Super. 198, 202-03 (App. Div. 1994) (noting that the rule requires that "all reasonable means to procure the declarant's attendance at trial must be exhausted" before a finding of unavailability can be made).

In State v. Hamilton, 217 N.J. Super. 51, 55 (App. Div. 1987), a witness named Bunn was living in Virginia with a foster family. The State made some inquiries but was unable to obtain a specific address that could have been used to compel the witness's attendance under the Interstate Compact, N.J.S.A. 2A:81-18 to -23. The court rejected the State's contention that the witness was unavailable, explaining:

> We are unpersuaded that the State acted with due diligence to procure Bunn's attendance. It appears to us that it did little more than make a number of telephone inquiries in New Jersey and of people in Virginia as to Bunn's whereabouts and thereafter acquiesced in their refusal to cooperate.

[Hamilton, 217 N.J. Super. at 55.]

Similarly, in State v. Hacker, 177 N.J. Super. 533, 540 (App. Div. 1981), this court affirmed the trial court's ruling precluding the admission of prior testimony by a witness who was in Aruba at the time of trial. The court noted that, although the witness was "beyond the jurisdiction of the court at the time of trial[,]" he could not properly be considered unavailable because he was a New Jersey attorney who "could have been subpoenaed before trial . . . thus, defendant failed to show that he sought with 'due diligence' to procure the attendance of the witness." Ibid.; see also State v. Maben, 132 N.J. 487, 498 (1993) (noting that proof of "a good-faith effort" to procure live testimony is required for a finding of unavailability, and "[g]ood faith is determined based on the circumstances of each case" (citation omitted)).

Williams is particularly instructive. In that case, Williams, the driver of the front vehicle in a four-vehicle collision, sued the driver of the rear-most car, Hodes, who had "caus[ed] a chain reaction collision" leading to her injury. 363 N.J. Super. at 601. Hodes, in turn, joined as third-party defendants the drivers of the other two vehicles, Duryea and Harley. Williams did not sue them directly. Ibid. Before trial,

35

counsel for Williams served counsel for Duryea and Harley with notices in lieu of subpoena as to their respective clients.  Ibid.

On the day scheduled for trial, just prior to jury selection, Hodes took a voluntary dismissal as to Duryea and Harley.  Ibid. The case continued to the next day, during which time plaintiff's counsel (1) "prepared and faxed subpoenas naming Durye[a] and Harley to a commercial subpoena server with directions that they be served on an expedited basis," (2) tried to call the witnesses directly, and (3) "sought the cooperation of counsel who had represented them."  Id. at 601-02.  When trial began the following day, however, the efforts to procure their testimony had been unsuccessful, and the trial court refused to admit their deposition testimony on the grounds that plaintiff's counsel failed to use reasonable diligence to subpoena them.  Id. at 602-03.

We reversed, relying upon the continuing effect of a notice in lieu of subpoena on a settling party.  Well before trial, both Harley and Duryea had received valid notices in lieu of subpoena pursuant to Rule 1:9-1.  Id. at 603-04.  Rule 1:9-1 concerns the issuance of subpoenas and also provides, in pertinent part, that "[t]he testimony of a party who could be subpoenaed may be compelled by a notice in lieu of subpoena served . . . . at least [five] days before trial."  A witness can be held in contempt for failure to appear in response to a subpoena, while a party who

fails to honor a notice in lieu of subpoena can be sanctioned in other ways.  R. 1:2-4; R. 1:9-5.

We disagreed with the trial judge's holding that Duryea and Harley were "relieved of any compulsion to testify" once dismissed as parties:

> Because sanctions for failure to appear, short of contempt, are applicable to a witness under a notice in lieu . . . dismissal of a party to the action under such a notice does not abrogate the former party's duty to appear and testify unless specifically released by the noticing attorney or the judge.
>
> [Williams, 363 N.J. Super. at 604.]

Additionally:

> the duty to appear as a witness embodied in a duly served notice in lieu survives the dismissal of the case against that party. Every party litigant is a potential witness. Professional courtesy suggests the use of notices in lieu where a party is represented by counsel to ensure the presence at trial of the client as a witness.  The efficiency and economy embodied in the rule would be lost, if upon dismissal as party, that party can also simply walk away as a witness.
>
> [Ibid.]

Furthermore, the trial court abused its discretion in precluding the deposition testimony of Duryea and Harley because, "[u]nder the circumstances here," plaintiffs' counsel "exercised 'reasonable means' to procure their attendance at trial in the

short period of time she had available." Id. at 605 (citation omitted).

In this case, the trial judge failed to recognize the Williams principle that the "duty to appear and testify unless specifically released by the noticing attorney or the judge" is not abrogated simply because the party subject to the notice in lieu of subpoena leaves the case. When served with Universal's valid notices in lieu of subpoena, the settling defendants became subject to that duty and were subject to sanctions by the court for failing to perform that duty.

Against that backdrop, the efforts undertaken by counsel for Universal to obtain compliance with the notices in lieu of subpoena did not suffice. When sending the notices, Universal correctly advised counsel for the settling defendants that the notice would "remain in effect in the event your client settles or is dismissed from the case." Nevertheless, in the communications following up on the notices, Universal did not advise the settling defendants that their appearances continued to be required or again allude to their continuing duty to appear and testify. Universal did not request witness names or schedules or otherwise attempt to actually procure a live witness. Rather, Universal essentially inquired whether the settling defendants planned to voluntarily appear at trial and then confirmed that they did not. It was an abuse of

discretion for the trial court to conclude that this inquiry was adequate. It was not.

## VI.

Universal's reliance on evidence that was improperly admitted to establish allocation does not mean that on a retrial it cannot produce sufficient proofs to enable it to satisfy the requirements of the Act and benefit from apportionment. The existing ruling regarding both Universal's liability and the amount of damages is left in place. Despite Universal's floodgates argument that the practical implications of a reversal would bring New Jersey's asbestos litigation to a standstill, they offer no rationale justifying exempting this type of litigation from routine applications of the evidence rules. There is no rational basis for such an exemption.

Thus, having found the court erroneously admitted interrogatory responses and deposition excerpts because they were not presented as proofs against the statement-makers, and because Universal failed to demonstrate the unavailability of witnesses, we reverse and remand on the issue of apportionment.

## VII.

Plaintiff also contends that the court erred by advising the jury that other defendants had settled prior to trial. The basis

for this argument is that the trial court did not balance the prejudicial effect against probative value.

Plaintiff, for the first time on appeal, argues that the word "settled" should not have been used in the jury instructions because of its potential for prejudice. At the charge conference, the trial court reviewed the portion of the jury instructions referencing the existence and identities of the settled defendants, then stated:

> [A]nd then I'm going to add in where the defendant proposed additional language, ["]your verdict will not result in those settled defendants having any additional obligation or being required to pay any additional monies to the plaintiff." I'm going to add that in there.

Plaintiff's counsel responded:

> I would object to that. The same way that I think that our courts have disfavored the court--the court instructing the jury that the percentage of liability that they assess to another defendant will reduce the amount that the trial defendant will have to pay and have said that it's inappropriate . . . for the court to give that type of ultimate outcome charge. . . .
>
> It's--I believe it's also inappropriate for the judge--for the Court to talk about what might happen with regard to a settling codefendant. And if-- the Court tells the jury that those companies won't have to pay, then I would ask that the Court tell the jury, but the plaintiffs' ultimate recovery will be reduced by the amount that you assess to those settling codefendants. I don't think it's

> fair to do one without the other, and I think
> our courts have really disfavored both.

The trial court answered, "Well, I agree with you then I need to provide a further explanation" and "I can't make this one[-]sided." Over a defense objection, the court agreed to include the instruction proposed by plaintiffs' counsel that "any percentage of liability assessed against a codefendant will reduce the amount of money, if any, the plaintiff will collect from Universal."

"It is a well-settled principle that appropriate and proper jury charges are essential to a fair trial." State v. Savage, 172 N.J. 374, 387 (2002) (citation omitted). The jury charge constitutes "a road map to guide the jury, and without an appropriate charge a jury can take a wrong turn in its deliberations." State v. Martin, 119 N.J. 2, 15 (1990). "A portion of a charge alleged to be erroneous, however, 'cannot be dealt with in isolation . . . [and] should be examined as whole to determine its overall effect.'" Savage, 172 N.J. at 387 (alteration in original) (quoting State v. Wilbely, 63 N.J. 420, 422 (1973)).

The trial court charged the jury as follows:

> A number of other companies were originally named as defendants in this case. Before the trial began some of the defendants settled their differences with the plaintiff.

41

> As a result the following defendants were not present or represented by an attorney during this trial: . . . .
>
> You are not to speculate as to the reasons why the plaintiffs and those defendants I have just listed settled their dispute. You should not be concerned about the amount, if any, that may have been paid to resolve the plaintiffs' claims against these defendants.
>
> You must decide the case based upon the evidence you find credible, and the law as a I instruct you. Your verdict will not result in those settled defendants having any additional obligation or being required to pay any additional money to the plaintiffs.
>
> However, the plaintiffs['] recovery will be reduced by any percentage you allocate to the settled defendants.

Thus, the trial court addressed the objection plaintiff actually raised to the charge. The issue was resolved in plaintiff's favor by adding language proposed by plaintiff's counsel.

Plaintiff now argues that Shankman v. State, 184 N.J. 187 (2005), requires reversal. Plaintiff, however, did not object at the time jury instructions were discussed and does not now argue that the use of the word "settled" in the pretrial instructions was error. The judge had informed the jury that plaintiffs "resolved their differences" with settling defendants before trial, and that the jury should not speculate as to the reasons for that settlement.

Because plaintiffs did not raise any other objection to the portion of the jury charge concerning the settling defendants, plaintiff must show plain error in the court's inclusion of the word "settled" in the jury instructions.[5]  R. 2:10-2.

Plaintiff argues the Shankman case dictates a reversal. According to plaintiff, our Supreme Court recognized "the serious prejudicial influence the mention of 'settlement' can have upon a jury's consideration of the alleged liability of the settling defendant."  Plaintiff's reliance on Shankman, however, is misplaced.  The Court's decision related to the illegal quotient verdict rendered in that case.  Shankman, 184 N.J. at 195-205. The Court's discussion regarding the settling defendant was substantively very different than the issue pertaining to the settling defendants in this case.

In Shankman, the passenger's complaint alleged negligence on the part of her husband, the driver.  She had settled with him before her cause of action against the other driver was tried. The issue was whether the jury was misled by the court's

---

[5] Plaintiffs did not object at the time and do not argue on appeal that the use of the word "settled" in the pre-trial instructions was error.  At the start of trial, the judge said both that plaintiffs "resolved their differences" with the settling defendants before trial and that the jury should not speculate as to why these parties "settled their dispute."

instruction that they could consider the allegations in Shankman's complaint as evidence of fault. Id. at 194.

The Court said, "it would be entirely discordant were we to permit factual assertions, which have been made by a pleader in one count against one party, to be used as an 'admission' against that pleader in an issue in another alternative or inconsistent count in the same cause of action." Id. at 205-06. The Court also questioned whether the admission of other evidence regarding the settlement would be appropriate on retrial, cautioning the trial court to carefully weigh the relevance and potential prejudicial effect. Id. at 207-08. In fact, the Court reiterated that evidence of a settlement may not be introduced in order to show liability but is admissible when offered for a different purpose. Id. at 207-08.

Where a settlement is advanced as relevant, the probative value must be weighed against the prejudicial effect:

> When the probative value of an asserted bias by a plaintiff wife against her husband's co-defendants is minimal and cumulative, and the prejudicial value of the settlement is as great as it appeared to be in the initial trial of this matter, then the settlement should not be admitted. Admission of evidence about the settlement would put at risk the very policy rationale behind N.J.R.E. 408. That risk--that the jurors will be prejudiced and draw an inappropriate inference of liability--is a risk that is better avoided when engaging in N.J.R.E. 403 weighing.

A-4530-14T2

[*Ibid.*]

Plaintiff argues that the trial court "could have easily avoided" use of the "mention of 'settlement'" by simply using the word "resolved" instead. However, plaintiff did not suggest this accommodation earlier. Even if the suggestion was made, "[i]t is fundamental that a trial court is not bound to instruct a jury in the language requested by a party." State v. Thompson, 59 N.J. 396, 411 (1971). "If the subject matter is adequately covered in the text and purport of the whole charge, no prejudicial error comes into existence." *Ibid.*; see also Bolz v. Bolz, 400 N.J. Super. 154, 163 (App. Div. 2008) (holding that, "taking the charge as a whole," the court's summary of a witness's testimony was not error).

The jury in this case was advised, in a straight-forward manner, that corporations besides Universal "were originally named as defendants" and that "[b]efore the trial began some of the defendants settled their differences" with plaintiff. This does not raise the concerns of prejudice and misunderstanding addressed by the Shankman Court.

Moreover, it has long been the practice in New Jersey that,

> where multiple tort-feasors are or may be jointly responsible for an individual's injuries and losses, and one or more of them effect a settlement in exchange for a covenant

> not to sue, the fact of the settlement, but not the amount paid, is generally brought to the attention of the jury at the trial.
>
> [Theobold v. Angelos, 40 N.J. 295, 303-04 (1963).]

"When the jury has such knowledge, speculation is avoided as to the reason for the absence from the proceedings of an additional potentially liable person." Id. at 304. In accordance with this rationale, the model jury charges provide instructions for the trial court to adapt for use both before openings and following summations when settled defendants are involved. See Model Jury Charges (Civil), 1.11G, "Settling Defendants" (rev. May 2007); Model Jury Charges (Civil), 1.17, "Instructions to Jury In Cases In Which One Or More Defendants Have Settled With The Plaintiff" (approved May 1997).

Essentially, jurors have to be told the facts of a settlement in order to avoid juror speculation. Theobold, 40 N.J. at 304. The danger of this speculation arises whenever a jury is asked to make a liability determination regarding an absent party, regardless of whether that party appeared for any portion of the trial.

Finally, a reviewing court is concerned with the "overall effect" of a jury charge rather than allegedly erroneous words "in isolation." Savage, 172 N.J. at 387 (citation omitted). In this

case, the trial judge clearly advised the jurors that they were "not to speculate as to the reasons" the settling defendants settled and they "should not be concerned about the amount, if any" that was paid. In these circumstances, the trial court's charge did not create prejudice. The trial judge's mention of the settled defendants complied with well-established precedent.

## VIII.

Plaintiff argues that the motion for judgment notwithstanding the verdict should have been granted. She contends that Rowe's exposure to asbestos supplied by Universal was so great that the jury must have improperly ignored it if they found Universal was only twenty percent liable. We do not agree.

"An appellate court will not reverse a trial court's determination of a motion for a new trial 'unless it clearly appears that there was a miscarriage of justice under the law.'" Delvecchio v. Twp. of Bridgewater, 224 N.J. 559, 572 (2016) (quoting R. 2:10-1). Moreover, a reviewing court "should not disturb the findings of the jury merely because it would have found otherwise upon review of the same evidence." Ibid.; see also Carrino v. Novotny, 78 N.J. 355, 360 (1979) ("[A] jury verdict, from the weight of evidence standpoint, is impregnable unless so distorted and wrong, in the objective and articulated view of a judge, as to manifest with utmost certainty a plain

miscarriage of justice." (citation omitted)); <u>Crego v. Carp</u>, 295 N.J. Super. 565, 578 (App. Div. 1996) ("[N]either a trial judge nor an appellate court may reweigh the evidence and impose a new verdict simply because they disagree with the jury's decision.").

The trial judge rejected plaintiffs' motion, noting that (1) Rowe testified regarding his use of each of the settling defendants' products, and (2) plaintiffs' expert testified that all of Rowe's exposure to asbestos throughout his lifetime significantly contributed to his mesothelioma. The judge remarked that "we will never know ultimately what this jury considered as credible" and denied plaintiffs' motion.

There was considerable evidence that Rowe was repeatedly exposed to Universal cement over the course of many years. Nonetheless, given the experts' somewhat conflicting testimony, it was not a manifest injustice for the jury to decline to adopt the type of strict proportionality allocation plaintiff contends was appropriate.

At the close of Universal's case, plaintiff moved to dismiss the claims for apportionment, arguing that no sufficient basis for allocation existed. The court denied the motion, stating:

> No, the [c]ourt is satisfied because the--
> although there--you know, one could contend
> that there were no expert proofs to assist the
> jury on allocations, there were factual proofs
> that were presented, and it ultimately will

> be up to the jury to determine whether they are sufficient. So that application is denied.

However, the court failed to undertake a specific evaluation of the proofs as to each settling defendant in turn to determine whether Universal's proofs established a prima facie case against that defendant.

In order to satisfy its burden as to the settling defendants sufficient to create a question for the jury, Universal was obliged to "prove two types of causation: product-defect causation and medical causation." Hughes v. A.W. Chesterton Co., 435 N.J. Super. 326, 337 (App. Div. 2014). Product-defect causation proofs concern the absence of a warning when the asbestos-containing product leaves the defendant's control. Ibid.

To present a prima facie case of medical causation, Universal was obliged to satisfy the "frequency, regularity and proximity" test this court adopted in Sholtis v. Am. Cyanamid Co., 238 N.J. Super. 8 (App. Div. 1989). Under this test, the party with the burden of proof "only need produce evidence from which a fact-finder, after assessing the proof of frequency and intensity of plaintiff's contacts with a particular manufacturer's friable asbestos, could reasonably infer toxic exposure." Id. at 29. The frequency, regularity and proximity test "is not a rigid test with an absolute threshold level necessary to support a jury verdict."

<u>James v. Bessemer Processing Co.</u>, 155 N.J. 279, 302 (1998) (quoting <u>Tragarz v. Keene Corp.</u>, 980 F.2d 411, 420 (7th Cir. 1992)).

Nevertheless, a plaintiff "cannot rest on evidence which merely demonstrates that a defendant's asbestos product was present in the workplace or that he had 'casual or minimal exposure' to it." <u>Estate of Brust v. ACF Indus., LLC</u>, 443 N.J. Super. 103, 126 (App. Div. 2015) (citations omitted). The <u>Brust</u> case is particularly useful here.

In <u>Brust</u>, the plaintiff had mesothelioma and, as to her claims against brake-shoe-related defendants, presented evidence that she "was exposed to asbestos through contact with her father while he handled asbestos-contaminated brake shoes on at most four occasions, and through washing his clothes on at most eight occasions." <u>Id.</u> at 126. The court acknowledged that "mesothelioma can develop from minimal exposure to asbestos," but held that "the exposures established by this record are so few and so limited that they simply fail to meet the 'frequency, regularity, and proximity' test." <u>Id.</u> at 126-27. Thus, the court held that the brake-shoe-related defendants were entitled to summary judgment. <u>Id.</u> at 127.

Here, in addition to failure to warn, Universal needed to establish as to each settling defendant that Rowe had sufficient exposure to that defendant's asbestos-containing products that a

50

jury could "reasonably infer toxic exposure." <u>Sholtis</u>, 238 N.J. Super. at 29. However, no such proof existed for some of the settling defendants, even including the improperly admitted settling defendants' evidence.

As to Trane, for example, Rowe testified that about sixty to sixty-five of the new American Standard boilers he installed had to be taken apart for installation. Rowe also testified that he removed some boilers made by this company, but it was not clear how many such boilers he removed or how many, if any, were broken apart for removal. It was also not clear if the dust generated by removal came from the boiler components as opposed to the old, dried Universal cement. American Standard's interrogatory responses simply said that some of its boilers "may have contained components manufactured by third parties" that "may have" contained asbestos, but they also stated that American Standard boilers were specially machined so that they did not require asbestos rope or gaskets to seal the cast iron sections. From this limited evidence, no reasonable fact-finder could conclude that Rowe's toxic exposure to asbestos came from an American Standard boiler. Therefore, although we reject plaintiff's contention, we caution the trial court to separately examine the sufficiency of proofs as to each settling defendant on remand.

Reversed and remanded for a new trial on the issue of apportionment.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION